**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**TBCOM PROPERTIES, LLC, ,**

       **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　　　**Case No. 6:06-cv-1677-Orl-28KRS**

**CITY OF NEW SMYRNA BEACH,**

       **Defendant.**

_____

## ORDER

Plaintiff, TBCom Properties, LLC ("TBCom"), brought a two-count Complaint seeking, in Count I, a declaratory judgment that Defendant, City of New Smyrna Beach ("City"), violated the Federal Telecommunications Act of 1966 ("TCA" or "the Act") and that the City's denial of TBCom's application to build a monopole tower is null and void; and, in Count II, an injunction mandating that the City approve TBCom's application as submitted. (Pl.'s Compl., Doc. 1.) On May 15, 2007, the Court entered an Order granting in part and denying in part TBCom's Motion for Summary Judgment on the two counts, concluding that the City failed to set forth the rationale for its vote to reject TBCom's application in a "writing" as required by the Act. (Doc. 29 at 8.) Without a written rationale from the City, the Court declined to consider whether the City's denial substantively violated the Act; TBCom's injunction request was also unripe.

The Court granted the City thirty-five days to provide its reasoning (id.), which was filed as a written order by the City on June 18, 2007. (Doc. 34-2.) Two days later, TBCom

moved for leave to file a Renewed Motion for Summary Judgment, (Doc. 35), but during the Final Pretrial Conference the parties agreed that the Court could consider whether the City's denial of TBCom's application was supported by substantial evidence contained in a written record based on the parties' original briefs.

## I.  Background

TBCom provides service to licensed personal wireless telecommunication providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities. (Pl.'s Compl. ¶ 6.)  TBCom leases land owned by Southeast Interstate Complex, LLC ("Southeast"), a business entity owned by Mr. Paul Holub.  Due to a cellular service coverage gap by T-Mobile USA, Inc., TBCom has proposed to build a 195-foot monopole telecommunications tower in the southeast quadrant of the intersection of Interstate 95 ("I-95") and State Road 44 in Volusia County, just outside of the New Smyrna Beach Activity Center, which includes a portion of all four quadrants surrounding the intersection. (Id. ¶ 7; Ex. 15-3 at 16; Doc. 34-4 at 3.)  Capable of accommodating up to six wireless service providers, the tower would improve customer access to emergency cellular services along a major evacuation corridor of Florida.  (Doc. 54-14 at 16-22, 37.)  The proposed site is currently zoned Business Planned Unit Development ("BPUD") and development on the site is governed by a BPUD Agreement, made between the City and Southeast on June 17, 2005.  (Def.'s Answer ¶ 7; Doc. 1-2.)  The proposed tower is not permitted by the BPUD. (Pl.'s Compl. ¶ 10.)

On May 18, 2006, TBCom applied to amend the BPUD to permit building the proposed tower.  (Doc. 15-2 at 3.)  An application to amend the BPUD Agreement is treated

like a request for rezoning the parcel, and therefore it must undergo full review. See New Smyrna Beach, Fla., Code § 504.02, PUD, Procedure for rezoning to PUD (4)(e); Ex. B to Doc. 17. The City's planning and zoning department staff reviewed the application and recommended that it be denied because the proposed tower would be too close to I-95 and too close to future development on Lot 4 of the parcel. (Doc. 15-3 at 18; Doc. 15-4 at 60.) The staff made the following additional findings, each of which was addressed by TBCom's counsel during the quasi-judicial hearing: 1) the proposed tower would potentially limit future development of the lot by about 2800 square feet, or 14 parking spots; 2) the department staff had objected to another cell tower proposed seven years ago; 3) the tower will be visible to customers who eventually patronize future business development in the area; and 4) the tower is undesirable in the Activity Center.[1] On July 10, 2006, the Board also voted to recommend denial to the City Commission. (Doc. 15-4 at 51-52.) The City Commission considered the application to amend the BPUD Agreement, which was embodied in

---

[1] As for the staff's ultimate conclusion, which appears to have been accepted and adopted by the City – that the proposed tower would be located too close to I-95 and to future development on Lot 4 – the City did not clarify whether the concern was one of safety or general aesthetics, although staffmember Mark Rakowski did say, "I think the main concern was just seeing it from the main roads and so close to the road." (Hr'g Tr. 24, 57, Sept. 26, 2006, Ex. B to Doc. 15.) TBCom presented evidence that the tower was designed to collapse within 65 feet of its standing location in the unlikely event that it should fall and that towers are compatible with commercially-zoned areas. (Id. at 24.) The company also proposed camouflaged tower applications to address the City's concern and pointed out that the tree-lined median provides a visual buffer for southbound traffic. All telecommunications towers are visible; the City never explained why a tower that is visible from a main thoroughfare and evacuation route is an issue. Nonetheless, I conclude that the potential visual impact that the tower might have on unrealized development does not constitute substantial evidence supporting denial of the application, particularly in light of the existing structures in the area.

Ordinance No. 80-06, at a quasi-judicial hearing on September 26, 2006, and voted to deny the application. (Hr'g Tr. 1, 3, 76-77, Sept. 26, 2006, Ex. B to Doc. 15.)

## II. Analysis

The Federal Telecommunications Act authorizes courts to review local zoning decisions affecting the erection of telecommunications towers. 47 U.S.C. § 332(c)(7)(B)(v). The "Act was designed to remove 'barriers to entry' and to increase competition in the Telecommunications industry." AT&T Wireless PCS, Inc. v. City of Atlanta, 50 F. Supp. 2d 1352, 1356 (N.D. Ga. 1999) (quoting TCG Detroit v. City of Dearborn, 977 F. Supp. 836, 839 (E.D. Mich. 1997)). In aid of that purpose, the Act "limits the ability of state and local zoning authorities to regulate the placement and construction of personal wireless service facilities, such as communications towers." Id. Congress, however, did not intend the Telecommunications Act "to supplant local zoning authority." Riverside Roof Truss, Inc. v. Bd. of Zoning, 734 So. 2d 1139, 1142 (Fla. 5th DCA 1999); see also 47 U.S.C. § 332(c)(7). Instead, it merely implemented substantive and procedural requirements applicable to the regulation of wireless service facilities. "Specifically, the TCA: 1) prohibits unreasonable discrimination among providers of functionally equivalent services; 2) forbids zoning decisions which prohibit or have the effect of prohibiting the provision of personal wireless services; and 3) requires that any denials of a request to construct or place personal wireless facilities be in writing and 'supported by substantial evidence contained in a written record.'" Benjamina Nursery Farm, Inc. v. Miami Dade County, 170 F. Supp. 2d 1246, 1250 (S.D. Fla. 2001) (citing 47 U.S.C. § 332(c)(7)(B)(i), (iii)). TBCom contends that the City's denial of its application was not supported by substantial evidence.

"'Substantial evidence' means 'more than a mere scintilla.' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In employing this standard, however, a court is not free to substitute its judgment for that of the local governing body. Rather, the court must conclude that it cannot find conscientiously that the evidence supporting the decision is substantial, when viewed against the record in its entirety." Benjamina, 170 F. Supp. 2d at 1252 (internal citations omitted); see also OPM-USA-Inc. v. Bd. of County Commm'rs of Brevard County, 7 F. Supp. 2d 1316, 1323 (M.D. Fla. 1997). "While not as stringent as preponderance of the evidence, it does mandate 'a harder look' at agency action than the 'arbitrary and capricious' standard." Group EMF, Inc. v. Coweta County, 50 F. Supp. 2d 1338, 1342 (N.D. Ga. 1999) (citing Color Pigments Mfrs. Ass'n, Inc. v. Occupational Safety & Health Admin., 16 F.3d 1157, 1160 (11th Cir. 1994)).

Applying these standards, I find the City's decision to deny TBCom's application to amend the BPUD Agreement is not supported by substantial evidence contained in the written record. Only TBCom put forth evidence relating to the proposed tower; the City met TBCom's proffered evidence with generalized opinions and speculation. The City has also repeatedly taken the position that TBCom failed to carry its burden, arguing that "TBCom failed to provide substantial, competent evidence that Southeast authorized or desired to unilaterally reject its BPUD Agreement by erecting a structure not agreed to by the City," (Doc. 34-2 at 3); "[I]t is counterintuitive that [Southeast] would wish this change without the agreement of the City. But it is not the burden on (sic) the City to hypothecate that Southeast wishes to repudiate its Agreement. That burden would fall on TBCom if it were acting on behalf of Southeast and nowhere has that burden been met," (id. at 2-3); and "The

Land Development Regulations . . . make[] clear that the burden shifting theory of TB Com (sic) to require the City to prove that TB Com (sic) is not entitled to unilaterally quadruple the height limitation in the BPUD is meritless." (Doc. 17 at 4.) Although the City's legal conclusions and positions are confusing, the Court is satisfied that the primary burden rests on the City because the Telecommunications Act currently[2] "shifts the burden of proof to the locality to present 'substantial evidence' to justify its decision to deny an application; the provider, as plaintiff, will never have to present 'substantial evidence' to prove that the zoning board should have approved the project." Kevin M. O'Neill, Wireless Facilities Are a Towering Problem: How Can Local Zoning Boards Make the Call Without Violating Section 704 of the Telecommunications Act of 1966?, 40 Wm. & Mary L. Rev. 975, 996 (1999); Omnipoint Commc'ns Enters., Inc. v. Town of Amherst, 74 F. Supp. 2d 109, 122-23 (D.N.H. 1998) ("Although a telecommunications provider must come forward with a certain minimal amount of information in support of its applications in order to prevail, once an application has been supported this provision places the burden of proof to support any denial on the local government entity issuing the denial."); OPM-USA-Inc. v. County of Marion, No. 97-290-CIV-OC-10B, 1999 WL 1427699, at *10 (M.D. Fla. Sept. 30, 1999); Primesite Consulting Group, Inc. v. City of Tampa, No. 98-2085-CIV-T-24(B), 1999 WL 33743963, at *6 (M.D. Fla.

---

[2] Although the federal courts disagree as to which party bears the burden, in 1997 a proposal to shift the burden from the locality to the wireless service provider was made to Congress, further supporting the Court's conclusion that it is the City's burden to show that its denial was based on substantial evidence. Kevin M. O'Neill, Wireless Facilities Are a Towering Problem: How Can Local Zoning Boards Make the Call Without Violating Section 704 of the Telecommunications Act of 1966?, 40 Wm. & Mary L. Rev. 975, 996 n.137 (1999) (citing S. 1350, 105th Cong. (1997)).

Sept. 30, 1999); <u>Primeco Personal Commc'ns Ltd. v. Lake County</u>, No. 97-208-CIV-OC-10B, 1998 WL 565036, at *7 (M.D. Fla. July 20, 1998); <u>see also</u> <u>Smart SMR of New York, Inc. v. Zoning Comm'n of the Town of Stratford</u>, 995 F. Supp. 52, 56 (D. Conn. 1998); <u>Sprint Spectrum L.P. v. Town of N. Stonington</u>, 12 F. Supp. 2d 247, 254 (D. Conn. 1998); <u>Sprint Spectrum L.P. v. Town of Easton</u>, 982 F. Supp. 47, 49 (D. Mass. 1997); <u>Sprintcom, Inc. v. Vill. of Mundelein</u>, No. 98-C-4451, 1999 WL 652032, at *7 (N.D. Ill. Aug. 20, 1999).

In the City's recently submitted written order, Mayor Vandergrifft wrote, "TBCom's application to amend the BPUD Development Agreement . . . fails to comply with the City's Land Development Regulations, is violative of the agreed upon zoning plan for the southeast quadrant of the intersection of Interstate 95 and State Road 44 known as the Activity Center, is contrary to the adopted standards for the development of the City's western gateway and is unnecessary for cellular telephone service because the Utilities Commission's telecommunications tower provides an adequate facility." (Doc. 34 at 1.) The City also cites the following reasons[3] for denying TBCom's application to amend the BPUD Agreement:

> 1. TBCom's application for amendment to Southeast BPUD Development Agreement is insufficient for failing to comply with Section 504.00, Procedure for Rezoning to PUD (2)e, LDR.
> 2. TBCom failed to provide substantial competent evidence that Southeast authorized or desired to unilaterally reject its BPUD Agreement by erecting a structure not agreed to by the City.
> 3. Southeast voluntarily relinquished any entitlement to uses such as the telecommunications tower when it agreed to the

---

[3] The City also includes the following: "7. All provisions of Section 365.172(11)(d), [Florida Statutes] and the Telecommunications Act have been complied with or voluntarily waived by TBCom as applicant." (Doc. 34-2 at 4.) The meaning of this statement is unclear. There is no subsection (11)(d) to section 365.172, Florida Statutes. However, this statement does not appear to be a reason behind the City's denial of TBCom's application.

>development plan. <u>City of New Smyrna Beach v. Andover Development [Corp.]</u>, 672 So. 2d 618 (5th DCA Fla. 1996).[4]
>4. The erection of a telecommunications tower on Southeast's property would be the antithesis of the Activity Center plan for providing a gateway to the City and urban commercial and business mixed use development.
>5. The Utilities Commission tower provides the needed capacity for collocation of cellular service antennae upon the repair of its temporary deficiencies.
>6. TBCom (sic) actions in discouraging the collocation of antennae on the Utilities Commission tower is violative of Section 365.172(11), [Florida Statutes].

(Doc. 34-2 at 3-4.)

The City's first two cited reasons relate to the City's contention that TBCom does not have the authorization of Southeast, the property owner, to apply for an amendment to the BPUD Agreement. It has been suggested that this is a possible fact issue precluding summary judgment. While the question of TBCom's authorization may be disputed, this

---

[4] This stated reason for denying TBCom's application is rejected out of hand. The New Smyrna Code includes a process by which parties may apply for an amendment to a PUD Agreement; there is no permanent waiver of any entitlement to seek an amendment in the Code. <u>City of New Smyrna Beach v. Andover Development Corp.</u>, 672 So. 2d 618 (Fla. 5th DCA 1996), supports TBCom's position, not the City's. In <u>Andover</u>, a developer tried to effect an end-run around the amendment and review process; it has no bearing here. Contrary to the City's assertion, TBCom has not attempted to unilaterally amend the [BPUD] Agreement. By seeking an amendment to the BPUD Agreement, TBCom seeks the approval of the City. The interplay between the City's zoning regulations and the Federal Telecommunications Act adds a new dimension to the consideration of TBCom's application that has been entirely ignored by the City. In determining whether to approve or deny TBCom's request, the City must comply with the Telecommunications Act.

The allegations that Southeast relinquished any right to seek another permitted use for its BPUD zoning district or that Southeast is attempting to "unilaterally amend the Agreement" (Doc. 6 ¶¶ 10-11) are also the basis of the City's counterclaim either for breach or for a declaration "that amendments to the Agreement can take effect upon the voluntary agreement of both parties." (<u>Id.</u> at 4.) The City has not moved for summary judgment on this counterclaim or addressed its counterclaim to the Court. It is unclear whether the City has abandoned it.

dispute of fact is not material to the determination of the City's compliance with the Act because there is no evidence in the written transcript of the quasi-judicial hearing that the City based its denial on that possibility.  *If* TBCom does not have Southeast's permission to seek an amendment of the BPUD Agreement, that fact is only relevant to TBCom's request for an injunction because TBCom cannot build a tower against the interests of the property owner.  The authorization question is not, however, relevant to the determination of whether the City's denial is supported by substantial evidence.  There is absolutely no evidence that TBCom lacks the required authorization, much less that the City considered that possibility at the hearing when it denied TBCom's petition.

TBCom did not comply with New Smyrna Beach Code section 504.00, Procedure for Rezoning to PUD (2)(e), because its application did not include certification that the applicant had the property owner's authorization.  During the final pretrial conference, counsel for TBCom conceded that the parties could come to Court and have a "trial" on this issue and that authorization could be quickly proven by providing the Court with a copy of the lease agreement between TBCom and Southeast.  Neither Southeast nor Mr. Holub have intervened in this action.  Despite that technical noncompliance, the City considered the application, did not require TBCom to rectify the deficiency in the application, and never suggested that authorization was one of its concerns during the commission hearing. During the city commission hearing, the commissioners expressed no doubt that TBCom had Southeast's consent; indeed, the commissioners were indignant that the property owner authorized TBCom's application, in effect 'undoing' the work put into developing the BPUD

Agreement.[5]  Minutes of the Local Planning Agency Planning and Zoning Board meeting of July 10, 2006, state: "Timothy O'Shaughnessy of TBCom Properties, LLC, 1133 Louisiana Avenue, Suite 114, Winter Park, *authorized representative on behalf of the property owner*, Southeast Interchange Complex, LLC, 675 North Beach Street, Ormond Beach, requests an amendment to the Southeast Interchange PUD Master Development Agreement to allow communication towers as a permitted use."  (Doc. 14 at 7 (emphasis added).)  The City did not consider the possibility that TBCom did not have Southeast's authorization when it denied TBCom's application, and the City "should not be permitted to construct a basis for denial after the fact."  Group EMF, Inc. v. Coweta County, 131 F. Supp. 2d 1335, 1344 (N.D. Ga. 2000); see also OPM-USA-Inc., 7 F. Supp. 2d at 1325 ("This reason appears to be an after-the-fact excuse made by the Board without substantial evidence in the record to support it and merely to justify its earlier decision to deny [the] application without alerting [the plaintiff] or giving it the opportunity to object or to present evidence on the . . . issue.").

---

[5] Commissioner Hathaway said, "And it kind of makes one wonder what Mr. Holub was thinking about when he entered into any kind of agreement with your company that you represent in light of how much time we spent in trying to hammer out an agreement for that property."  (Hr'g Tr. at 30, Ex. B to Doc. 15.)  The Commissioner then stated, "I'm just amazed that Mr. Holub, after all the many hours that this City staff and Commission has spent on this particular intersection . . . would actually enter into an agreement to lease the property to you."  (Id.)  Commissioner Richenberg continued, "I mean you got to understand, as much as we worked on the activity center out there in developing the . . . architectural guidelines, the character of that area, the gateway of the city, we spent a lot of time on that area.  And if you don't believe us, ask Mr. Holub who you've got this – this agreement with. And that's what our concern is, is that, you know, we would like to keep, you know, that gateway of our City, you know, to – to be what we worked on – to represent what we worked on."  (Id. at 41.)

The City also contends that TBCom's application was denied because the tower conflicts with the aesthetics of the City's "gateway" as the "antithesis of the Activity Center plan." (Doc. 34-4 at 4.) In response, TBCom presented evidence that the proposed 195-foot tower is not incompatible with already existing structures in the area, including two gas station signs of 110 and 91 feet and the Utilities Commission tower, which stands at 190 feet. (Hr'g Tr. 12-13, Sept. 26, 2006, Ex. B to Doc. 15.)  The tower's design is such that it will minimize visual impact; a slim-silhouetted monopole design is proposed rather than other more obtrusive structures. (Id. at 14.)  When Commissioner Hathaway raised concerns about the Activity Center's architectural design standards, TBCom responded that the design guidelines for the Activity Center only extend 600 feet into the PUD; the proposed tower lies 713 feet into the PUD, or 113 feet beyond the Activity Center schematic boundary. (Id. at 29-31.)  No one challenged those representations or offered any support for the City's contention that it could impose its Activity Center or "gateway" protection on land beyond its original boundaries. (Id. at 31.)

Lastly, the City based its denial on the possibility that an already existing Utilities Commission tower will be available for collocation of cellular service antennae, which would address the wireless service gap without requiring the erection of the 195-foot monopole. TBCom argues that the Court cannot consider the possibility of collocation on the utilities tower because at the time the City issued its denial, collocation on the tower was not possible due to structural and electrical deficiencies. The commissioners accepted that the Utilities Commission tower was not a possible solution at that time, but they essentially wanted TBCom to "try harder" to secure collocation on the tower. (Id. at 27-28, 30.)  The City

proposed numerous alternative site locations, including on top of the gas station signs and in the middle of the conservation area of the PUD. None of the alternative locations were available, suitable, or "technically feasible." See Vill. of Mundelein, 1999 WL 652032, at *6. Even though the Utilities Commission tower apparently would accommodate the need that the proposed tower hopes to fill, at the time the City denied TBCom's application the existing tower was structurally uninhabitable and thus could not constitute substantial evidence supporting the denial of the application. The Court finds that the possible availability of the Utilities Commission tower is not relevant to an examination of the written record for substantial evidence supporting the City's denial. The possibility that the existing tower has been retrofitted to accommodate collocation in the meantime is relevant, however, when fashioning a remedy.

The City violated the Federal Telecommunications Act – first by failing to produce a writing setting forth the reasons it denied TBCom's application and then by making a decision without the support of substantial evidence. Summary judgment is due to be granted to TBCom on this ground.

### III.  Relief

"While the Telecommunications Act does require courts to hear and decide such actions 'on an expedited basis,' the statute does not specify the appropriate remedy." Group EMF, 131 F. Supp. 2d at 1346 (citing 47 U.S.C. § 332(c)(7)(B)(v)). Many courts have held that when a locality has violated the Act, remand is contrary to the Act's purposes and only further delays a process that the Act demands be expedited. Those courts have therefore issued mandatory injunctive or mandamus relief upon finding that the Act has been violated.

See e.g., id.; BellSouth Mobility v. Gwinnett County, 944 F. Supp. 923, 929 (N.D. Ga. 1996); AT&T Wireless PCS, Inc. v. City of Chamblee, 10 F. Supp. 2d 1326, 1334 (N.D. Ga. 1997); Illinois RSA No. 3, Inc. v. County of Peoria, 963 F. Supp. 732, 747 (C.D. Ill. 1997); Primeco, 1998 WL 565036, at *14. In part because the City initially violated the Act by failing to produce the required "writing," the current delay has led to a change in circumstances that renders issuing a mandatory injunction inappropriate.

In an affidavit, Robert J. Rodi, Chief Executive Officer/General Manager of the Utilities Commission, has stated that although structural deficiencies have prevented collocation of antennae on the existing utilities tower, the Utilities Commission accepted a bid on March 19, 2007 to rehabilitate the tower to make collocation feasible. (Ex. C to Doc. 17.) Mr. Rodi expects the rehabilitation process to be accomplished in two months. (Id.) Thus, the parties will proceed to trial on the issue of considering whether the balance currently favors issuing an injunction in favor of TBCom or whether the changed circumstances realign the equities in this case.

Accordingly, it is **ORDERED** and **ADJUDGED**:

1. TBCom's Motion for Summary Judgment (Doc. 15) is **GRANTED** as to Count I. The City of New Smyrna Beach is **DECLARED** to be in violation of the Federal Telecommunications Act of 1966; its denial of TBCom's application is null and void. The parties will proceed to trial on Count II to address TBCom's appropriate remedy.

2. This case is set for trial during the August 2007 trial term.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 3rd day of July, 2007.

                                                                                      _____
                                                                                      JOHN ANTOON II
                                                                                      United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party